UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TORY BURCH LLC; RIVER LIGHT V, L.P. <br><br>            Plaintiffs, <br><br>    v. <br><br> YONG SHENG INTERNATIONAL TRADE CO., LTD; CONGDADA PENA; BINGFENG QUI; LI YAXIACHAI; LI BIN et al. <br><br><br>            Defendants. | CIVIL ACTION NO. _____ <br><br> **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER, ORDER TO DISABLE CERTAIN WEB SITES, ASSET RESTRAINING ORDER, EXPEDITED DISCOVERY ORDER AND ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION** <br><br><br> [FILED UNDER SEAL PURSUANT TO 15 U.S.C. § 1116] |

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 5

    A.    TORY BURCH'S TRADEMARKS AND PRODUCTS ................................. 5

    B.    DEFENDANTS' COUNTERFEITING OPERATIONS ............................... 8

        *1.  Defendants' Sales of Counterfeit Products on Infringing Web Sites* ................................................................................................ 9

        *2.  Defendants' Use of Multiple False Identities to Avoid Detection.* ................................................................................... 12

ARGUMENT .................................................................................................................... 14

I.    DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION ............................. 14

II.    TORY BURCH IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ENJOINING DEFENDANTS' ILLEGAL ACTS ................................................................................................... 19

    A.    Defendants' Sale of Counterfeit Products Irreparably Harms Tory Burch's Marks, Goodwill and Business ................................................ 19

    B.    Tory Burch Is Likely to Prevail on Its Trademark Counterfeiting Claims ................................................................................................... 21

        *1.  Tory Burch's Marks Are Valid and Protectable* ............................... 21

        *2.  Consumers Are Likely to Be Confused as to the Source of Defendants' Counterfeit Products* ................................................... 22

    C.    Tory Burch Is Likely to Prevail on Its Anticybersquatting Consumer Protection Act Claim .......................................................... 23

        *1.  Tory Burch's Marks Are Distinctive and Famous* ............................. 23

i

|  |  | 2. | *The Infringing Domain Names Are Identical Or Confusingly Similar to of the TORY BURCH Marks* ........................................................... 24 |
|  |  | 3. | *Defendants Have Bad Faith Intent to Profit from Plaintiffs' TORY BURCH Marks* .................................................................................. 24 |
|  | D. | There Is a Fair Ground for Litigation And the Balance of Hardships Tips Decidedly in Tory Burch's Favor ................................................ 25 |
| III. | THIS COURT HAS THE AUTHORITY TO ISSUE AN EX PARTE ORDER .............. 26 |
| IV. | TORY BURCH IS ENTITLED TO AN ORDER PREVENTING THE TRANSFER OF DEFENDANTS' ASSETS ............................................................ 30 |
| V. | TORY BURCH IS ENTITLED TO EXPEDITED DISCOVERY ................................... 32 |
| VI. | SERVICE OF PROCESS BY EMAIL IS WARRANTED IN THIS CASE .................. 33 |
| CONCLUSION ............................................................................................................................... 37 |

<u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                                    Page(s)

*Advanced Portfolio Technologies, Inc. v. Advanced Portfolio Technologies Ltd.*,
   No. 94 Civ. 5620, 1994 U.S. Dist. LEXIS 18457 (S.D.N.Y. Dec. 28, 1994) ............................31

*Ahava (USA), Inc. v. J.W.G. Ltd.*,
   250 F. Supp. 2d 366 (S.D.N.Y. 2003) ................................................................................20

*American Network, Inc. v. Access Ammerica/Connect Atlanta*,
   975 F. Supp. 494 (S.D.N.Y. 1997) ....................................................................................18

*Ballistic Products, Inc. v. Precision Reloading, Inc.*,
   2003 U.S. Dist. LEXIS 13148 (D. Minn. July 28, 2003) ..........................................................28

*Banff, Ltd. v Federated Dept. Stores Inc.*,
   841 F.2d 486 (2d Cir. 1988) ....................................................................................21, 22

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
   171 F.3d 779 (2d Cir. 1999) ..........................................................................................15

*Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Tamraz*,
   No. 97 Civ. 4759 (SHS), 2006 U.S. Dist. LEXIS 39256 (S.D.N.Y. June 13, 2006) ...............35

*Bensusan Restaurant Corp. v. King*,
   126 F.3d 25 (2d. Cir 1997) ..........................................................................................15

*Best Van Lines, Inc. v. Walker*,
   490 F.3d 239 (2d Cir. 2007) ..........................................................................................16

*C.V. v. Allure Resorts Mgmt., LLC*,
   450 F.3d 100 (2d Cir. 2006) ..........................................................................................17

*Cartier Int'l B.V. v. Sam Liu*,
   02 CV 7926, 2003 U.S. Dist. LEXIS 6381 (S.D.N.Y. Apr. 17, 2003)................................27, 29

*Chanel, Inc. v. Lin et al.*,
   No. C-09-04996-JCS, 2010 U.S. Dist LEXIS 61295 (N.D.C.A. May 7, 2010)..................15, 34

*Chanel, Inc. v. Zhixian*,
   2010 U.S. Dist. LEXIS 50745 (S.D. Fla. Apr. 29, 2010) .........................................................33

*Chloe v. Queen Bee of Beverly Hills*,
   616 F.3d 158 (2d Cir. 2010) ....................................................................................16, 17

*Corning Glass Works v. Jeanette Glass Co.*,
   308 F. Supp. 1321 (S.D.N.Y.), *aff'd*, 432 F.2d 784 (2d Cir. 1970) ......................................26

*Cutco Industries, Inc. v. Naughton*,
   806 F.2d 361 (2d. Cir 1986) ..........................................................................................15

*Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.*,
   604 F.2d 200 (2d Cir. 1979) ..........................................................................................19

*Diarama Trading Co., Inc. v. J. Walter Thompson U.S.A., Inc.*,
  2005 U.S. Dist. LEXIS 22830 (S.D.N.Y. Sept. 6, 2005) ........................................................22

*eBay, Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ........................................................20

*El Greco Leather Prods. Co. v. Shoe World, Inc.*,
  806 F.2d 392 (2d Cir. 1986) ........................................................20

*Firma Melodiya*,
  882 F. Supp. 1306 (S.D.N.Y. 1995) ........................................................20

*Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*,
  25 F.3d 119 (2d Cir. 1994) ........................................................19

*Ford Motor Co. v. Lapertosa*,
  126 F. Supp. 2d 463, 62 U.S.P.Q.2d 1789 (E.D. Mich. 2000) ........................................................29

*Freedom Calls Found. v. Bukstel*,
  2006 U.S. Dist. LEXIS 19685 (E.D.N.Y. Mar. 3, 2006) ........................................................23

*Hanson v. Denckla*,
  357 U.S. 235 (1958) ........................................................15

*Hasbro, Inc. v. Lanard Toys, Ltd.*,
  858 F.2d 70 (2d Cir. 1988) ........................................................20

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
  466 U.S. 408 (1984) ........................................................15

*Home Box Office, Inc. v. Showtime/Movie Channel, Inc.*,
  832 F.2d 1311 (2d Cir. 1987) ........................................................20

*ICG Am., Inc. v. Wine of the Month Club, Inc.*,
  No. 3:09-cv-133 (PCD), 2009 U.S. Dist. LEXIS 77151 (D. Conn. Aug. 28, 2009) ................15

*International Shoe Co. v. Washington*,
  326 U.S. 310 (1945) ........................................................15

*John Wiley & Sons, Inc. v. Swancoat*,
  No. 08 Civ. 5672 (JGK), 2009 U.S. Dist. LEXIS 71820 (S.D.N.Y. Aug. 14, 2009) ...............17

*Levi Strauss & Co.*,
  51 F.3d 982 (11th Cir. 1995) ........................................................31

*Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*,
  378 F. Supp. 2d 448 (S.D.N.Y. 2005) ........................................................21, 22

*Louis Vuitton Malletier & Oakley, Inc. v. Veit*,
  211 F. Supp. 2d 567 (D. Pa. 2002) ........................................................24, 25

*Lucas Nursery v. Grosse*,
  359 F.3d 806 (6th Cir. 2004) ........................................................23

*Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*,
  264 F.3d 32 (2d Cir. 2001) ........................................................18

*Mattel, Inc. v. Internet Dimensions, Inc.*,
　　55 U.S.P.Q. 2d 1620 (S.D.N.Y. 2000) ................................................................24

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
　　84 F.3d 560 (2d Cir. 1996) .................................................................................18

*Mullane v. Central Hanover Bank & Trust Co.*,
　　339 U.S. 306 (1950) ............................................................................................35

*New York City Triathlon*, LLC v. *NYC Triathlon Club, Inc.*,
　　No. 10 Civ. 1464(CM), 2010 U.S. Dist. LEXIS 45081 (S.D.N.Y. May 4, 2010).....................19

*Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*,
　　175 F.3d 266 (2d Cir. 1999) ...............................................................................21

*Paco Rabanne Parfums, S.A. v. Norco Enterps.*,
　　680 F.2d 891 (2d Cir. 1982) ...............................................................................20

*Parker Waichman Alonso v. The Orlando Firm*,
　　09 Civ. 7401 (CM), 2010 U.S. Dist. LEXIS 47957 (S.D.N.Y. May 14, 2010) ......................17

*Phillip Morris v. Veles LTD.*,
　　No. 06 CV 2988 (GBD), 2007 U.S. Dist. LEXIS 19780 (March 13, 2007) ...............15, 33, 34

*Polaroid Corp. v. Polarad Elecs. Corp.*,
　　287 F.2d 492 (2d Cir. 1961), cert. denied, 368 U.S. 820 (1961).................................22

*Prediction Co. LLC v. Rajgarhia*, Slip Copy,
　　No. 09 Civ. 7459 (SAS), 2010 U.S. Dist. LEXIS 26536 (S.D.N.Y. Mar. 22, 2010) ...............34

*Prime Publishers, Inc .v. Am.-Republican, Inc.*,
　　160 F. Supp. 2d 266 (D. Conn. 2001) .................................................................24

*Reebok Int'l Ltd. v. Marnatech Enter.*,
　　737 F. Supp. 1521 (S.D. Cal. 1989), *aff'd* 970 F.2d 552 (9th Cir. 1992) ...........31, 32

*Republic of Philippines v. Marcos*,
　　862 F.2d 1355 (9th Cir. 1988), cert. denied, 490 U.S. 1035 (1989).........................31

*Rio Properties, Inc. v. Rio International Interlink*,
　　284 F.3d 1007 (9th Cir. 2002) ..................................................................34, 35, 36

*Salinger v. Colting*,
　　607 F.3d 68 (2d Cir. April 30, 2010).................................................................20

*Tishman v. The Associated Press*,
　　2006 U.S. Dist. LEXIS 4622 (S.D.N.Y. Feb. 6, 2006) .........................................34

*Tom Doherty Assocs. v. Saban Entm't, Inc.*,
　　60 F.3d 27 (2d Cir. 1995) ...................................................................................21

*Trans Union LLC v. Credit Research, Inc.*,
　　142 F. Supp. 2d 1029 (N.D. Ill. 2001).................................................................29

*Warner Bros., Inc. v. Gay Toys, Inc.*,
　　658 F.2d 76 (2d Cir. 1981) .................................................................................19

*Zippo Mfg. Co. v. Zippo DOT Com, Inc.,*
    952 F. Supp. 1119 (W.D. Pa. 1997) ..........................................................................16

## Federal Statutes

15 U.S.C. § 1051 ....................................................................................................19

15 U.S.C. § 1057(b)................................................................................................21

15 U.S.C. § 1114 ...........................................................................................27, 29, 30

15 U.S.C. § 1125(d)................................................................................................23

15 U.S.C. §§ 1051 ....................................................................................................2

15 U.S.C. §§ 1116(d).............................................................................................22

15 U.S.C. 1116(d)..................................................................................................28

15 U.S.C. § 1116(d)(4)(B)......................................................................................27

15 U.S.C. § 1117 ....................................................................................................31

15 U.S.C. § 1116 ....................................................................................................26

H.R. 4279 (October 13, 2008) .................................................................................2

Pub. L. 104-153 (July 2, 1996)................................................................................2

## Federal Rules

Fed. R. Civ. P. 4(f)(3)..............................................................................................34

Fed. R. Civ. P. 30(b)...............................................................................................32

Fed. R. Civ. P. 4......................................................................................................34

Fed. R. Civ. P. 4(f)..................................................................................................34

Federal Practice and Procedure § 1061 .................................................................34

Federal Rules of Civil Procedure Rules 64 ............................................................31

Tory Burch LLC and River Light V, L.P. (collectively "Plaintiffs" or "Tory Burch") submit this Memorandum of Law in support of their *ex parte* Application for a Temporary Restraining Order, Order to Disable Certain Web Sites, Asset Restraining Order, Expedited Discovery Order and Order to Show Cause for Preliminary Injunction against YONG SHENG INTERNATIONAL TRADE CO., LTD; CONGDADA PENA; BINGFENG QUI; LI YAXIACHAI; LI BIN, et al. (collectively, "Defendants") based on an action for trademark counterfeiting and cybersquatting arising under the Trademark Act of 1946, 15 U.S.C. §§ 1051 et seq., as amended by the Trademark Counterfeiting Act of 1984, Public Law 98-473 (October 12, 1984), the Anti-Cybersquatting Consumer Protection Act of 1996, Pub. L. 104-153 (July 2, 1996), and the Prioritizing Resources and Organization for Intellectual Property Act of 2007, H.R. 4279 (October 13, 2008) (the "Lanham Act").

## PRELIMINARY STATEMENT

Trademark counterfeiting is an illegal, multi-billion dollar business that harms both consumers, who are deceived into believing they are buying genuine goods when they are actually buying counterfeits, and brand owners, who are deprived of sales and subject to a loss of goodwill from these low-quality counterfeits bearing their marks.  The Internet has made it easy for counterfeiters to conceal that the goods they are selling are fake, hide their true identities and operate under multiple false names and addresses from extra-territorial locations in an attempt to avoid liability.

Tory Burch is a New York-based fashion house which produces the extremely popular TORY BURCH brand of footwear, handbags, apparel, accessories and other products, such as those pictured below.  Tory Burch owns all rights in the TORY BURCH trademarks, including numerous federal registrations.





**Tory Burch Classic REVA Ballerina Flat**       **Tory Burch JET Tote**

Tory Burch has learned that an interrelated group of counterfeiters is selling fake Tory Burch products on dozens of "rogue" Internet web sites targeting consumers in the United States, including in this Judicial District.  Defendants set up their web sites to appear to be authorized retailers of genuine Tory Burch products, even though investigation has revealed that they are selling counterfeits and that they are based in China.  These 'rogue' web sites are written in English, accept payment in U.S. dollars and allow payment by PayPal and/or major credit cards. Defendants often perpetuate the illusion that these are authorized Tory Burch web sites by using domain names incorporating the TORY BURCH trademarks (*e.g.,* toryburch-sale.com, toryburch2011.com, toryburchworld.com, toryburchs-shoes.com) and copying Tory Burch's original photos,  proprietary designs and detailed product descriptions directly from Tory Burch's own web site, such as in those 'rogue' web sites pictured below.

   

**Counterfeit site -  onlytoryburch.com**      **Counterfeit site -- Toryburchsshoes.com**

Tory Burch has received numerous complaints from consumers who reported purchasing what they believed were genuine Tory Burch products on these authentic-looking web sites, only to receive low-quality counterfeit products.  Defendants are also selling large quantities of counterfeit Tory Burch products at wholesale on "selling pages." akin to stand-alone web sites, Defendants have set up on popular third-party "business-to-business" ("B2B") selling platforms, such as ECplaza.net, Tradekey.com and DIYtrade.com.

While Defendants claim to be selling genuine Tory Burch products, nothing could be further from the truth.  Tory Burch's investigators have purchased more than forty (40) Tory Burch products, at least one from each named Defendant, and every product received to date has been identified as counterfeit.

                                   

**Authentic Tory Burch REVA Ballerina Flat**      **Counterfeit TORY BURCH REVA Flat**

Tory Burch's investigators have shown that these infringing web sites are being operated by and that these counterfeit Tory Burch products originate from, a smaller group of

3

interconnected counterfeiters. In order to avoid detection, these counterfeiters are concealing their true identities and utilizing a variety of phony company names and false identities in connection with various facets of their operations.

Given such shadowy and anonymous operations, counterfeiters such as the Defendants are notoriously difficult to stop. Even when a brand owner such as Tory Burch challenges Defendants' sales of counterfeit goods by requesting that a particular Internet Service Provider, web host and/or third party selling platform remove the infringing web site or selling page, Defendants lose no inventory, retain all of their profits and simply move that portion of their business to another web host or selling platform. To freeze Defendants' activities -- or at least effectively chill them -- Plaintiffs respectfully request that this Court issue, *ex parte*: (i) a Temporary Restraining Order and Preliminary Injunction against Defendants enjoining the manufacture, importation, distribution, offer for sale, and sale of the counterfeit Tory Burch products; (ii) an Order temporarily disabling Defendants' web sites selling counterfeit Tory Burch Products, including those hosted at domain names containing the TORY BURCH trademarks, (iii) an Order temporarily restricting transfer of Defendants' assets to preserve Tory Burch's right to an equitable accounting; (iv) an Order for Expedited Discovery allowing Tory Burch to access, inspect, and copy records relating to Defendants' manufacture, distribution, offer of sale, and sale of the counterfeit Tory Burch products and Defendants' financial accounts; and (v) an Order allowing service by electronic mail. Tory Burch does not request this relief lightly. If the requested relief is not granted, Defendants' intentional and unlawful counterfeiting will continue to cause irreparable harm to the reputation and goodwill of the TORY BURCH brand symbolized by the TORY BURCH trademarks.

## FACTUAL BACKGROUND

**A.    Tory Burch's Trademarks and Products**

The TORY BURCH brand, founded in early 2004, is an attainable, luxury, lifestyle brand defined by classic American sportswear with an eclectic sensibility, which embodies the personal style and spirit of its co-founder and creative director, Ms. Tory Burch.  Perceiving a void in the market for a sophisticated American aesthetic at an accessible price point, Ms. Burch sought to create a line of stylish yet wearable clothing and accessories for women, including footwear, handbags, apparel, accessories and other products ("Tory Burch Products") bearing Tory Burch's well-known, federally registered trademarks (collectively, the "TORY BURCH Marks"). (Declaration of Amanda Sachs, dated  December 13, 2010 ("Sachs Decl." ¶4)).  In 2005, the TORY BURCH brand was hailed by Oprah Winfrey on her television show as "the next big thing" in fashion. (*Id.* ¶5).  Since then, the brand has steadily increased in popularity and reputation with Ms. Burch winning the coveted "Accessory Designer of the Year" award at the 2009 Council of Fashion Designers of America Awards. (*Id.* ¶5).  Today, the TORY BURCH brand is recognized as one of the most popular and sought-after American women's fashion brands. (*Id.* ¶6).  Many laudatory articles have been written about the TORY BURCH brand, and Tory Burch Products are regularly featured in editorials in top fashion magazines. (*Id.*)  Among the most well-known and popular of the Tory Burch Products are the iconic REVA ballerina-style flats, bearing Tory Burch's famous  logo. (*Id.* ¶4).  Tory Burch maintains strict quality control standards for all of its Tory Burch Products.  Genuine Tory Burch Products are inspected and approved by Tory Burch or its agents prior to distribution and sale. (*Id.* ¶7).

Genuine Tory Burch Products are distributed in over thirty (30) TORY BURCH boutiques and five TORY BURCH outlet stores in the United States, as well as internationally in

5

various TORY BURCH boutiques, and through Tory Burch's Internet web store located at www.toryburch.com (the "Tory Burch Web Store").  Genuine Tory Burch Products are also distributed through a worldwide network of authorized licensees, distributors, and retailers, including high-end department stores such as Bloomingdales and Saks Fifth Avenue, as well as a number of specialty boutiques. (*Id.* ¶8.)

A significant portion of Plaintiffs' sales of Tory Burch Products come from its Tory Burch Web Store, redesigned in 2009 to give online customers the experience of shopping at a Tory Burch boutique. (*Id.* ¶9).  The Tory Burch Web Store features Tory Burch's proprietary images and designs, including images of the Tory Burch Products and of Ms. Burch. (*Id.*)  Tory Burch has devoted and continues to devote a great deal of time and resources to creating these images and designs as part of Tory Burch's seasonal ad campaigns and to maintaining its Tory Burch Web Store. (*Id.*)  The Tory Burch Web Store is extremely popular, enjoying hundreds of thousands of unique visitors per month. (*Id.*).

Tory Burch is the owner of a well-established family of famous trademarks, including, *inter alia*, TORY BURCH, REVA, and ⊕ (previously defined as the "TORY BURCH Marks") for use with its collection of footwear, handbags, apparel, accessories and other related goods and services. (*Id.* ¶10).  In addition to the common law rights Tory Burch has developed in the TORY BURCH Marks, Tory Burch is the owner of numerous federal trademark and service mark registrations with the U.S. Patent and Trademark Office for the TORY BURCH Marks, including, *inter alia*, the following federal registrations:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 3,428,374 | TORY BURCH | Handbags; Umbrellas; Cosmetic bags sold empty |
| 3,386,532 | TORY BURCH | Retail clothing stores |

6

| 3,428,816 | TORY BURCH | Jewelry |
|---|---|---|
| 3,428,373 | TORY BURCH | Coats; Dresses; Footwear; Headwear; Jackets; Pants; Shirts; Shorts; Skirts; Sleepwear; Sweaters; Swim wear; Tops |
| 3,814,500 | TORY BURCH | Candles |
| 3,758,631 | TORY BURCH | Eyewear; Eyewear cases |
| 3,479,178 | REVA | Footwear |
| 3,563,326 |  | A full line of women's clothing and footwear; A full line of handbags |
| 3,024,142 |  | Retail clothing apparel and accessories stores |
| 3,029,795 |  | Candles; Jewelry; Accessories, namely, handbags, umbrellas and cosmetic bags sold empty; Housewares, namely, wood boxes and furniture; Housewares, namely, bed sheets, table linens and towels; Clothing, namely, shirts, tops, sweaters, pants, skirts, shorts, dresses, bathing suits, bikinis, sarongs, shoes, socks, belts, undergarments, robes and headwear; Outerwear, namely, scarves, jackets, vests and coats. |
| 2,990,110 |  | Retail luxury clothing apparel and fashion accessories stores, excluding, footwear. |

All of the TORY BURCH Marks are valid, subsisting, unrevoked and uncancelled. (*Id.*). Tory Burch also owns common law rights in the TORY BURCH Marks and trade name for use in connection with Tory Burch and the Tory Burch Products, and has registered many of these trademarks in the People's Republic of China, among other jurisdictions. (*Id.* ¶11).

Tory Burch displays its TORY BURCH Marks and Tory Burch Products in its advertising and promotional materials. To date, Tory Burch has spent millions of dollars in advertising and promoting the TORY BURCH Marks and Tory Burch Products, which has resulted in substantial sales of Tory Burch Products and invaluable goodwill for the TORY BURCH brand. (*Id.* ¶13). The continuous and broad use of the TORY BURCH Marks in connection with Tory Burch Products, as well as the prominent use of these marks in advertising and marketing, has enabled Tory Burch to achieve widespread fame, and has made the TORY BURCH Marks themselves among the most famous and widely-recognized marks in the fashion industry. Consumers, potential customers and other members of the public and fashion industry not only associate Tory Burch Products with high-quality materials, style and workmanship, but also recognize that Tory Burch Products originate exclusively with Tory Burch. (*Id.* ¶14). Consequently, Tory Burch has acquired and enjoys an outstanding reputation and significant goodwill associated with the TORY BURCH Marks on the Tory Burch Products, and the TORY BURCH Marks are thus invaluable assets to Plaintiffs. Given the enormous value of the TORY BURCH Marks, Tory Burch makes great efforts to combat the distribution and sale of counterfeit Tory Burch Products bearing the TORY BURCH Marks. (*Id.* ¶15).

**B.      Defendants' Counterfeiting Operations**

Tory Burch has become aware that Defendants have set up dozen of 'rogue' web to sell counterfeit Tory Burch Products. With absolutely no authorization from Tory Burch,

Defendants, an interrelated group of anonymous counterfeiters, are manufacturing distributing, importing, offering to sell and selling counterfeit versions of Tory Burch Products bearing the TORY BURCH Marks ("Counterfeit Products") to consumers in New York and elsewhere in the U.S.  Defendants' counterfeiting is deceiving consumers, who believe they are buying genuine Tory Burch Products, and causing irreparable harm to the TORY BURCH brand.

1. *Defendants' Sales of Counterfeit Products on Infringing Web Sites*

Defendants have established dozens of different stand-alone web sites to sell counterfeit Tory Burch Products (the "Infringing Web Sites"). (Declaration of Matthew Hewlett, dated December 10, 2010 ("Hewlett Decl." ¶¶6-7)).  These Infringing Web Sites are designed to appear to unknowing consumers to be legitimate U.S. based web stores authorized to sell genuine Tory Burch Products. (Hewlett Decl. ¶22).  They are sophisticated-looking, written in English and accept payment in U.S. dollars and allow payment through PayPal and/or major credit cards. (*Id.* ¶7, Exhibit A). These sites copy Tory Burch's proprietary images and designs from the Tory Burch Web Store, proprietary photos of the Tory Burch Products, and detailed product descriptions directly from Tory Burch's own web site in order to appear themselves to be authorized Tory Burch web sites. (Hewlett Decl. ¶¶7-8; *see* Sachs Decl. Exhibit C).

In order to further deceive customers and so that their sites will rank high on any web browser searches for "Tory Burch," Defendants have set up many of Infringing Web Sites at domain names containing the TORY BURCH Marks. (Hewlett Decl. ¶9).  The following is a list of fifty three (53)  domain names (the "Infringing Domain Names") containing the TORY BURCH Marks Defendants have registered and are using in bad faith in connection with their Infringing Web Sites and to sell Counterfeit Products:

| | |
|---|---|
| cheap-toryburchshoes.com | toryburch-retail.com |
| discounttoryburch.com | toryburch-retailshop.com |

| | |
|---|---|
| discounttoryburch.org | toryburch-sale.com |
| etoryburch.com | tory-burch-sale.com |
| lovetoryburch.com | toryburchsale.net |
| saletoryburch.com | toryburchsale.org |
| sale-toryburch.com | toryburchsaler.com |
| tory-burch.us | toryburchsell.com |
| toryburch2011.com | toryburch-shoes.us |
| toryburchbag.com | toryburchshoesonsale.com |
| toryburchbest.com | toryburchshoes-onsale.com |
| toryburchbrand.com | toryburchshoesoutlets.com |
| toryburchbrandstore.com | toryburchshoes- outlets.com |
| toryburchclassic.com | toryburchshoesstore.com |
| toryburchcom.com | toryburchshop.us |
| toryburchfans.com | toryburchshops.com |
| toryburchflatssale.com | toryburchsoutlets.org |
| toryburch-home.com | toryburch-store.com |
| toryburch-mall.com | toryburchstores.com |
| toryburchnow.com | toryburchto.com |
| toryburchoffical.com | toryburchtopsale.com |
| toryburchok.com | toryburchuk.com |
| toryburchonsale.com | toryburchus.com |
| toryburch-outlet.com | toryburchyes.com |
| toryburchoutlet.org | toryshoes.com |
| toryburchoutlets.org | us-toryburchshoes.com |
| toryburchoutletshop.com | |

(Hewlett Decl. ¶9).

In addition to operating the Infringing Web Sites, Defendants are selling Counterfeit Products at wholesale by setting up "selling pages" on third-party Internet B2B selling platforms such as Alibaba.com, Tradekey.com and DIYtrade.com (the "B2B Sites"). (*Id.* ¶10). The B2B Sites are online marketplaces that connect third-party sellers of wholesale goods, primarily in China and Hong Kong, with prospective buyers, primarily in the U.S., who resell these products to U.S. consumers at retail. (*Id.*). The B2B Sites are written in English, and certain of these sites are hosted on servers in the U.S. to provide faster connections for U.S.-based buyers. Sellers,

such as Defendants, who become members of one or more of the B2B Sites configure their own selling pages, where they can provide information, prices, and minimum order amounts, as well as payment and shipping information, display and offer products for sale, receive orders and communicate with buyers.  The Counterfeit Products sold by Defendants in wholesale quantities to buyers in the U.S. are then resold at retail to unknowing consumers as genuine Tory Burch Products on selling platforms such as eBay.com and in other online and brick-and-mortar retail venues. (*Id.*).

Defendants claim to sell genuine Tory Burch Products, but, in fact, all of the Tory Burch Products they sell are counterfeit. (*Id.* ¶¶ 13-15).  In the course of this investigation, Tory Burch's investigators have purchased forty one (41) items sold as genuine Tory Burch Products, at least one from each named Defendant.  As of the date of this filing, investigators have received thirty two (32) of these purchases and every one has been identified as a Counterfeit Product. (*Id.*).  These Counterfeit Products bear similar irregularities and indicia of being counterfeit to one another, indicating that the Counterfeit Products were manufactured by and come from a common source and that Defendants are interrelated. (*Id.* ¶16).  The Tory Burch Products that Defendants are selling can be identified as counterfeit in other ways, including the following: 1) none of the sellers of Tory Burch Products on the Infringing Web Sites are authorized manufacturers, distributors or sellers of Tory Burch Products, 2) Tory Burch has received numerous complaints from its consumers, indicating that they purchased on several of the Infringing Web Sites what they believed were authentic Tory Burch Products, but which were actually Counterfeit Products, 3) many of the alleged Tory Burch Products offered on the Infringing Web Sites can be identified as counterfeit based on the photographs of the products

11

alone, and 4) the prices and quantities of the Tory Burch Products offered on the Infringing Web Sites indicate they are counterfeit. (Sachs Decl. ¶ 20).

    2.    *Defendants' Use of Multiple False Identities to Avoid Detection.*

    Defendants, knowing that their activities are illegal, are concealing their identities and using demonstrably false names and incomplete identification information in connection with their operation of the Infringing Web Sites, and in all other facets of their operations in order to avoid detection. Defendants' Infringing Web Sites are devoid of any identifiable names or addresses of Defendants. Defendants communicate with potential customers exclusively via the Infringing Web Sites and/or by email without revealing their true identities. (Hewlett Decl. ¶30). When Defendants must provide their identity, they instead provide false or incomplete names and addresses. (*Id.* ¶17). The Internet Corporation for Assigned Names and Numbers (ICANN), the body that governs domain names, requires all who register domain names to provide accurate registration information, which is compiled in a network of publicly-available databases commonly referred to as "WhoIs." (Hewlett Decl. ¶23, Exhibit D). In most of Defendants' domain name registrations, as visible in the WhoIs database, Defendants' listed names and addresses are incomplete, nonsense, randomly-typed letters, or street addresses with no cities or states listed. (*Id.* ¶23). For example, the contact information listed for the domain name toryburchbrand.com, one of the Infringing Domain Names, is: "Linjianping, Putian Fujian CN 123456, 86.05712295019, fax: +86.05941234567, 405354738@qq.com." (*See* Hewlett Decl. Exhibit B). Plaintiffs' investigators have been unable to verify any of the names and addresses in Defendants' domain name registration as being genuine. (*Id.* ¶27)

    Defendants uniformly use separate false identities in connection with their shipments of Counterfeit Products to the U.S. to avoid detection and liability for counterfeiting by U.S.

Customs and Border Protection ("CBP") and/or by brand owners. All of the purchases received to date in Tory Burch's investigation were shipped from China via China Courier Service Corporation's Express Mail Service ("EMS"). These goods all arrived in similar packages with similar markings to one another, suggesting that many of them come from common or related sources. (*Id.* ¶17). CBP regulations requires that all packages entering the U.S. from another country be accompanied by a Declaration Form CN22 or Declaration Form CN23 (for commercial shipments) that must be completed in English. (*Id.* ¶18). The CN22 Declaration, which is incorporated into the EMS waybill, requires the sender to accurately state its name and address in English as well as and the contents of the package and to sign a declaration that the package does not contain "dangerous and or prohibited goods." (*Id.* ¶19). This EMS waybill also contains the following instruction in English and Chinese: "FOR PARCEL, PLEASE FILL IN THE DECLARATION FORM CN23, PROVIDE COMMERCIAL INVOICE OR PRO FORMA INVOICE AND CAREFULLY COMPLETE THE FORM BELOW IN ENGLISH." (*Id.* ¶20).

In every one of the thirty two (32) parcels containing Counterfeit Products received to date, the Defendants' CBP declaration requirements appear to be incomplete in the following ways: a) the CBP Declaration Form 22 does not contain a discernable or accurate return name and address of the sender, b) the CBP Declaration Form CN22 does not identify the true contents of the package, instead claiming the package contains something else such as "bed sheets," "t-shirt," "shoes," "flashlight," "gift," "sample" or "dress," c) the parcel was not accompanied by the required CBP Declaration Form CN23 and d) the parcel was not accompanied by the required commercial invoice. (*Id.* ¶21). Additionally, on the vast majority of Defendants' CBP Declaration Forms CN22, the return address information is in Chinese using Chinese characters rather than the required English, and most do not contain a signature declaring the package did

not contain "dangerous and prohibited goods." (*Id.*).  In short, Defendants' *modus operandi* is to use multiple false identities in every facet of their businesses in order to avoid detection for what they know are illegal activities.

Defendants' Counterfeit Products are not genuine, and Defendants are in no way authorized to sell the Counterfeit Products or operate the Infringing Web Sites. (Sachs Decl. ¶25).  Tory Burch did not manufacture, inspect, package, or approve the Counterfeit Products. (*Id.*).  The Counterfeit Products are so similar in appearance to genuine Tory Burch Products that consumers are being deceived, just as Defendants' intend, into believing the Counterfeit Products are genuine. (*Id.* ¶18).  Indeed, Defendants are using Plaintiffs' pictures of genuine Tory Burch Products on the Infringing Web Sites to sell Counterfeit Products.  While the Counterfeit Products have been designed to be exact copies of genuine Tory Burch Products and are being sold as such, they are not of the same quality as genuine Tory Burch Products. (*Id.* ¶24). Defendants' sale of Counterfeit Products is incredibly damaging to Tory Burch's reputation and goodwill, and without the relief requested by Tory Burch's instant motion, Defendants' illegal activities will continue unabated and Tory Burch will continue to suffer irreparable harm. (*Id.* ¶ 28).

## ARGUMENT

## I.    DEFENDANTS ARE SUBJECT TO PERSONAL JURISDICTION

Defendants are all subject to personal jurisdiction in New York and in this Judicial District.  Although Defendants are concealing their identities and operating under multiple false identities, it appears that Defendants are all non-residents of New York and located in China. (Hewlett Decl. ¶¶8, 13).  Defendants have more than sufficient contacts with New York, however, to establish personal jurisdiction in this forum based on the fact that each Defendant

operates one or more fully-interactive Internet web sites through which it offers to sell and sells Counterfeit Products directly to customers in this Judicial District and elsewhere in the US. (*Id.*).

Personal jurisdiction over a non-resident defendant is determined by the law of the jurisdiction where the federal court sits, in this case by New York law. *See Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 27 (2d. Cir 1997).  Because New York does not extend personal jurisdiction to the full extent permitted under the Due Process Clause of the US Constitution, a two-fold inquiry is required: (1) whether New York's Civil Practice Law and Rules provides for jurisdiction in this action and (2) whether exercising jurisdiction comports with the due process. *See Id.*; *International Shoe Co. v. Washington*, 326 U.S. 310 (1945).  Tory Burch asserts "specific" jurisdiction over Defendants as their contacts with New York are that the same counterfeiting activities that are the subject of this action.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n. 8 (1984).

Under New York's long arm statute, each Defendant is subject to personal jurisdiction under both C.P.L.R. § 302(a)(1) and § 302(a)(3)(ii) because each has offered and supplied counterfeit goods in New York and has committed tortious acts of trademark counterfeiting causing injury in New York.  Jurisdiction is appropriate under § 302(a)(1) when a defendant "purposefully avails itself of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *Cutco Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d. Cir 1986), *quoting Hanson v. Denckla*, 357 U.S. 235, 253 (1958).  A single transaction, such as each Defendant's sale and shipment of a Counterfeit Product to Tory Burch's investigators in New York, is sufficient to support personal jurisdiction if "the relevant cause of action also arises from that transaction." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999); *see also Chloe v. Queen Bee of Beverly Hills*, 616

F.3d 158 (2d Cir. 2010).  Furthermore, a "defendant need not be physically present in New York to transact business there within the meaning…of § 302(a)(1)." *Chloe*, 616 F.3d at 169.  Not only does each Defendant, through its one or more Infringing Web Sites, offer to ship Counterfeit Products to any address in the United States, including New York, each Defendant has actually shipped at least one Counterfeit Product  to New York as part of the investigation leading up to this action. (Hewlett Decl. ¶12).

Additionally, Defendants transact business in New York because each Defendant sells and offers to sell Counterfeit Products via one or more fully interactive Internet web sites accessible in this Judicial District, giving rise to personal jurisdiction under § 302(a)(1). The Second Circuit, like many jurisdictions, has recognized the district court's analysis in *Zippo Mfg. Co. v. Zippo DOT Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) to determine personal jurisdiction based on an Internet website's interactivity, to be "useful for analyzing personal jurisdiction under § 302(a)(1) … insofar as it helps to decide whether the defendant 'transacts any business' in New York." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 252 (2d Cir. 2007). Under the *Zippo test*, which measures the "nature and quality of commercial activity" of a web site, personal jurisdiction is proper when a non-resident, doing business over the Internet, enters into contracts with residents of a particular state which "involve the knowing and repeated transmission of computer files over the Internet." *Zippo Mfg*, 952 F. Supp at 1124.  Accordingly, courts routinely find that that defendants who sell counterfeit goods on fully-interactive web sites are subject to personal jurisdiction. *See, e.g.*, *Phillip Morris v. Veles LTD.*, No. 06 CV 2988 (GBD), 2007 U.S. Dist. LEXIS 19780 (March 13, 2007); *ICG Am., Inc. v. Wine of the Month Club, Inc.*, No. 3:09-cv-133 (PCD), 2009 U.S. Dist. LEXIS 77151, at *10-11(D. Conn. Aug. 28, 2009)("[i]nteractive, commercial websites permit personal jurisdiction to be exercised over a

defendant"); *Chanel, Inc. v. Lin et al.*, No. C-09-04996-JCS, 2010 U.S. Dist LEXIS 61295, at *17 (N.D.C.A. May 7, 2010)("[p]ersonal jurisdiction is appropriate where an entity is conducting business over the internet and has offered for sale and sold its products to forum residents").  In *Chloe v. Queen Bee of Beverly Hills, LLC*, the Second Circuit recently found jurisdiction over a non-resident online counterfeiter, concluding that he had "transacted business within the state under *§ 302(a)(1)*" based on defendant's sale and shipment of at least one counterfeit handbag in to New York and his operation of a highly interactive website that offered to sell and sold counterfeit goods anywhere in the US, including New York. *Chloe*, 616 F.3d at 169.  In the case at hand, each Defendant's transaction of business in New York is evidenced by the fact that each of the Infringing Web Sites, written in English, allows buyers to complete the purchase of Counterfeit Products over the Internet in U.S. dollars using PayPal or major credit cards and have such purchase shipped to any address in the U.S., including New York. (Hewlett Decl. ¶¶7, 12-13).

   In addition, each Defendant is subject to jurisdiction arising from the commission of a tortious act, trademark counterfeiting, in New York which is causing harm to Tory Burch, a resident of New York, meeting all five elements under C.P.L.R. § 302(a)(3)(ii): "(1) [t]he defendant committed a tortious act outside the state; (2) the cause of action arose from that act; (3) the act caused injury to a person or property within the state; (4) the defendant expected or should reasonably have expected the act to have consequences in the state; and (5) the defendant derives substantial revenue from interstate or international commerce." *See Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 106 (2d Cir. 2006).   This action is based on each Defendant's sale of Counterfeit Products in New York, from which each derives substantial revenue and which is causing a foreseeable harm to Tory Burch, a resident of New York.  *See*

*American Network, Inc. v. Access Ammerica/Connect Atlanta*, 975 F. Supp. 494, 497 (S.D.N.Y. 1997)(holding that plaintiff's injury from defendants' counterfeit sales within the state "includes harm to a business in the New York market in the form of lost sales or customers" and that it was "reasonably foreseeable" that defendant would face consequences in New York based on its operations).

The due process inquiry contains two parts, the minimum contacts inquiry and the reasonableness inquiry. *See Parker Waichman Alonso v. The Orlando Firm*, 09 Civ. 7401 (CM), 2010 U.S. Dist. LEXIS 47957, at *6 (S.D.N.Y. May 14, 2010). Under the minimum contacts inquiry, courts ask whether "the claim arises out of or relates to defendants' contacts with the state," which it clearly does in this instance, given that the entire claim relates to Defendants' sale of Counterfeit Products to U.S. and New York residents. *Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.,* 264 F.3d 32, 37 (2d Cir. 2001). The reasonableness inquiry then determines whether "defendant purposefully availed itself of the privilege of doing business in the forum so that defendant could reasonably foresee being haled into the forum's courts" and whether the assertion of jurisdiction "comports with traditional notions of fair play and substantial justice." *Id.* at 38; *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996). The notions of "fair play and substantial justice" support a finding a personal jurisdiction here, where each Defendant has purposefully availed itself of doing business in New York by selling illicit products in this Judicial District and could have reasonably foreseen being subjected to jurisdiction in New York. This is particularly true here as a matter of social policy given the enormous harm to consumers and commerce caused by Defendants' counterfeiting operations, as well as the egregious nature of Defendants' attempts to avoid being apprehended.

*See, e.g., John Wiley & Sons, Inc. v. Swancoat*, No. 08 Civ. 5672 (JGK), 2009 U.S. Dist. LEXIS

71820, at *8-9 (S.D.N.Y. Aug. 14, 2009).

## II.   TORY BURCH IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ENJOINING DEFENDANTS' ILLEGAL ACTS

Once a violation of the Trademark Act of 1946, 15 U.S.C. § 1051, et seq., as amended

(the "Lanham Act") is demonstrated, injunctive relief will readily issue. *See, e.g., Dallas*

*Cowboys Cheerleaders v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979); *Warner*

*Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 78 (2d Cir. 1981).  The Second Circuit holds that in

order to obtain preliminary injunctive relief, a movant must establish: (1) irreparable harm; and

(2) either (a) probable success on the merits or (b) sufficiently serious questions going to the

merits to make them a fair ground for litigation with the balance of hardships tipping decidedly

in favor of the party requesting preliminary relief. *Fisher-Price, Inc. v. Well-Made Toy Mfg.*

*Corp.*, 25 F.3d 119, 122 (2d Cir. 1994); *Dallas Cowboys Cheerleaders, Inc.*, 604 F.2d at 206-07

(applying standard to trademark infringement).  Courts in the Second Circuit routinely grant

preliminary injunctive relief when a party's trademark rights are threatened by the sale of

potentially inferior counterfeit versions of its products.  Courts base this relief on the trademark

holder's inability "to control the quality of the goods manufactured and sold under the holder's

trademark." *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir. 1986).  As

shown below, Tory Burch readily meets these criteria.

## A.   Defendants' Sale of Counterfeit Products Irreparably Harms Tory Burch's Marks, Goodwill and Business

The damage from counterfeits to a trademark owner through diminished goodwill, loss of

control over reputation or loss of quality control of its products is irreparable, and such is

sufficient for the granting of a preliminary injunction. *Paco Rabanne Parfums, S.A. v. Norco*

*Enterps.,* 680 F.2d 891, 894 (2d Cir. 1982) ("likelihood of damage to reputation and good

will...entitles a plaintiff to preliminary relief"); *Home Box Office, Inc. v. Showtime/Movie

Channel, Inc.*, 832 F.2d 1311 (2d Cir. 1987) (a showing of likelihood of confusion as to source

or sponsorship establishes the risk of irreparable harm as well as the requisite likelihood of

success on the merits).  This Court has held that, with respect to trademark infringement claims,

"irreparable harm may be presumed upon a showing that [a plaintiff's] trademark is protectable

and that a likelihood of confusion exists as to the ownership or source of goods in question," and

that "a showing of likelihood of [brand] confusion establishes both a likelihood of success on the

merits and irreparable harm." *Firma Melodiya*, 882 F. Supp. 1306, 1311 (S.D.N.Y. 1995); *Ahava

(USA), Inc. v. J.W.G. Ltd.*, 250 F. Supp. 2d 366, 369 (S.D.N.Y. 2003); *see also Hasbro, Inc. v.

Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988).  Even if irreparable harm from trademark

counterfeiting may no longer be presumed upon a finding of likelihood of success on the merits

based on the Supreme Court's decision in *eBay, Inc. v. MercExchange, L.L.C.* 547 U.S. 388,

390-1 (2006) and the Second Circuit's recent decision *Salinger v. Colting,* 607 F.3d 68, 77-78

(2d Cir. April 30, 2010), applying to patents and copyrights, respectively, Tory Burch has

presented sufficient evidence in its moving papers to support a finding of irreparable harm.  Tory

Burch has demonstrated its investment in and substantial goodwill it has amassed from its TORY

BURCH marks as well as the irreparable injury it is suffering from Defendants' operation of

Infringing Web Sites designed to look like genuine Tory Burch sites but selling lower-quality

Counterfeit Products, nearly identical in appearance to genuine Tory Burch Products.

Defendants' actions are causing Tory Burch irreparable injury by deceiving consumers, harming

Tory Burch's goodwill in its TORY BURCH Marks and depriving Tory Burch of sales.  *See,

e.g., New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, No. 10 Civ. 1464(CM), 2010

U.S. Dist. LEXIS 45081, at *46-50 (S.D.N.Y. May 4, 2010) (citing *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 37-38 (2d Cir. 1995)) (applying *Salinger* test but finding irreparable harm based on plaintiff's prospective loss of goodwill and loss of control over the reputation of its mark).

**B.     Tory Burch Is Likely to Prevail on Its Trademark Counterfeiting Claims**

To prevail on its trademark counterfeiting claims, Tory Burch must prove: (1) the TORY BURCH Marks are entitled to protection; and (2) there is a likelihood of confusion between Defendants' Counterfeit Products and genuine Tory Burch Products bearing the TORY BURCH Marks. *See, e.g., Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999); *Banff, Ltd. v. Federated Dept. Stores Inc.*, 841 F.2d 486, 489-90 (2d Cir. 1988); *see also Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 455 (S.D.N.Y. 2005).

1.     Tory Burch's Marks Are Valid and Protectable

Through its pleadings, Tory Burch has established that it is the owner of all right, title and interest in and to its TORY BURCH Marks in connection with the same type of goods and services being counterfeited by Defendants, namely footwear, handbags` and other accessories. *Supra* at pp. 4-6. Tory Burch has also demonstrated that its marks are the subject of multiple federal trademark registrations. (*Id.* ¶10; Sachs Decl. Exhibit D). These registrations are *prima facie* evidence of the validity of the TORY BURCH Marks, as well as Tory Burch's exclusive right to use its marks in commerce and in connection with the goods or services specified in the registrations. *See* 15 U.S.C. § 1057(b). Tory Burch's evidence is sufficient to create a likelihood that it will prevail in showing that the TORY BURCH Marks are valid and protectable.

2.      Consumers Are Likely to Be Confused as to the Source of Defendants'
Counterfeit Products

In the Second Circuit, likelihood of confusion is assessed by the factors enunciated in

*Polaroid Corp. v. Polarad Elecs. Corp.* 287 F.2d 492, 495-96 (2d Cir. 1961), *cert. denied*, 368

U.S. 820 (1961); *see also Banff, Ltd.,* 841 F.2d at 489-90.  Here, each of the eight, non-

exhaustive *Polaroid* factors used to analyze whether there is likelihood of confusion favor Tory

Burch: (1) the strength of the Plaintiffs' marks; (2) the degree of similarity between the

Plaintiffs' and Defendants' marks; (3) the proximity of the products; (4) the likelihood that the

prior owner will bridge the gap; (5) the sophistication of the buyers; (6) the quality of the

Defendants' product; (7) actual confusion; and (8) the Defendants' intent in adopting its own

mark. *See Polaroid Corp.*, 287 F.2d at 495.  Furthermore, this Court has held that, "where

counterfeit marks are involved, it is not necessary to perform the step-by-step examination of

each *Polaroid* factor because counterfeit marks are inherently confusing." *Lorillard Tobacco*,

378 F. Supp. 2d at 455.  A counterfeit mark is defined in the Lanham Act as a "spurious mark

which is identical with, or substantially indistinguishable from, a registered mark" on the

Principal Register of the United States Patent and Trademark Office, used by an unauthorized

producer. *See* 15 U.S.C. §§ 1116(d) and 1127.  Tory Burch has established that: (1) the marks

used by Defendants on the Counterfeit Products are identical to or substantially indistinguishable

from the TORY BURCH Marks which Tory Burch is using in commerce on its genuine Tory

Burch Products; and (2) Defendants' use of the TORY BURCH Marks on the Counterfeit

Products is not authorized by Tory Burch. *Supra* at pp. 8-9.  Additionally, Tory Burch has

received dozens of complaints from consumers who believed Defendants' Infringing Web Sites

were authorized online retail stores of authentic Tory Burch Products. (Sachs Decl. ¶18).  As

such, Tory Burch has demonstrated that consumers are likely to be confused as to the source of

22

Defendants' Counterfeit Products and that consumers are actually being confused by Defendants' sale of Counterfeit Products on the Infringing Websites.

**C.      Tory Burch Is Likely to Prevail on Its Anticybersquatting Consumer Protection Act Claim**

The Anticybersquatting Consumer Protection Act of 1996 ("ACPA") is applicable in instances when a domain name registrant has a bad faith intent to profit by "cybersquatting" a domain name that "is identical or confusingly similar to or dilutive of" the distinctive or famous mark of another. 15 U.S.C. § 1125(d). Courts have often stated that one of the focuses of the ACPA is to address counterfeit sellers who "register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site, and target distinctive marks to defraud consumers." *Lucas Nursery v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004); see also, *Diarama Trading Co., Inc. v. J. Walter Thompson U.S.A., Inc.*, 2005 U.S. Dist. LEXIS 22830, at *2-3 (S.D.N.Y. Sept. 6, 2005). Defendants are doing just that, having registered and used dozens of domain names containing the TORY BURCH Marks to divert consumers to Infringing Web Sites where they sell counterfeit Tory Burch Products.  Defendants have registered and are using at least the fifty three (53) previously-identified Infringing Domain Names containing the TORY BURCH Marks to sell Counterfeit Products. In order to prevail on its ACPA claim, Tory Burch must show that (1) its marks are distinctive and famous, (2) Defendants have registered domain names containing the identical marks and (3) Defendants are acting in bad faith. *Mattel, Inc. v. Internet Dimensions, Inc.*, 55 U.S.P.Q. 2d (BNA) 1620, 1621-22 (S.D.N.Y. 2000).

1.      Tory Burch's Marks Are Distinctive and Famous

As detailed earlier, Tory Burch's well-established TORY BURCH Marks are closely linked with Tory Burch's success, as these marks symbolize one of the most sought after

American women's fashion brands. (Sachs Decl. ¶¶5-8).  As a result, the TORY BURCH Marks

have a high degree of acquired distinctiveness, and, in turn, Tory Burch is likely to succeed in

showing that its TORY BURCH Marks are distinctive or famous.

   2.   The Infringing Domain Names Are Identical Or Confusingly Similar to the
        TORY BURCH Marks

   The Infringing Domain Names are identical or confusingly similar to the TORY BURCH

Marks, as they each contain the mark TORY BURCH in its entirety.  The inclusion of a

plaintiff's trademark combined with usage of the mark on the web site in question has been held

to be sufficient for a finding of confusing similarity for ACPA purposes. *Mattel, Inc.*, 55

U.S.P.Q. 2d 1620.  Courts have found that the addition of generic or geographic terms, such as

'buy,' 'sales,' 'store,' or 'online,' are not sufficient to distinguish the domain name from a

protected mark that it contains. *See, e.g., Prime Publishers, Inc. v. Am.-Republican, Inc.*, 160 F.

Supp. 2d 266, 279-280 (D. Conn. 2001); *Freedom Calls Found. v. Bukstel*, 2006 U.S. Dist.

LEXIS 19685, at *40-41 (E.D.N.Y. Mar. 3, 2006).  The fact that the entire mark TORY BURCH

appears without alteration in all of these domain names and each is used in connection with the

sale of counterfeit Tory Burch Products is sufficient to show that these Infringing Domain

Names are identical and or confusingly similar to the TORY BURCH Marks.

   3.   Defendants Have Bad Faith Intent to Profit from Plaintiffs' TORY BURCH
        Marks

   Courts have held that the registration of a trademark owner's mark as part of a domain

name used to sell counterfeit versions of the trademark owner's goods is a particularly egregious

form of bad faith. *See, e.g., Louis Vuitton Malletier & Oakley, Inc. v. Veit,* 211 F. Supp. 2d 567,

584-585 (D. Pa. 2002).  Bad faith could hardly be more clear than in a case like this, where

Defendants are using the TORY BURCH Marks in domain names used for the Infringing Web

Sites masquerading as authentic sources of Tory Burch Products but are in fact selling

Counterfeit Products.  The Court should not hesitate to find Tory Burch likely to succeed under

its ACPA claims.  In such cases, in addition to other damages, "a court may order the forfeiture

or cancellation of the domain name or the transfer of the domain name to the owner of the

mark." *Id.*

### D.     There Is a Fair Ground for Litigation And the Balance of Hardships Tips Decidedly in Tory Burch's Favor

Tory Burch strongly believes it has established the required likelihood of success as to

Defendants' liability for trademark counterfeiting and cybersquatting under the Lanham Act.

However, should this Court not find such likelihood of success on the merits, Tory Burch

respectfully submits that it has at least raised serious questions going to the merits of its claims,

and that the balance of hardships tips decidedly in Tory Burch's favor.

For the same reasons that Tory Burch is likely to prevail on its claims, Tory Burch has

raised serious questions for which there is a fair ground for litigation.  This Court must then

balance Tory Burch's harm from the wrongful denial of a Temporary Restraining Order and

Preliminary Injunction against any harm Defendants may suffer from granting an injunction that

would not be cured by prevailing on the merits and recovering on the injunction bond that Tory

Burch is required to post in conjunction with its request for injunctive relief.  As set forth above,

the harm to Tory Burch is irreparable.  The continued unauthorized use by Defendants of the

TORY BURCH Marks on Counterfeit Products further threatens Tory Burch's reputation, ability

to control the quality and appearance of products bearing the TORY BURCH Marks, and the

value of the TORY BURCH Marks as a designation of source.  The potential harm to

Defendants, on the other hand, is purely monetary.  Defendants have no legitimate interest in

selling Counterfeit Products or otherwise using TORY BURCH Marks without Tory Burch's

permission.  Moreover, given "the probable outcome of this action, this is a loss which [Defendants] may justifiably be called upon to bear." *Corning Glass Works v. Jeanette Glass Co.*, 308 F. Supp. 1321, 1328 (S.D.N.Y.), *aff'd*, 432 F.2d 784 (2d Cir. 1970).

## III.    THIS COURT HAS THE AUTHORITY TO ISSUE AN *EX PARTE* ORDER

Tory Burch requests this relief *ex parte* because experience in other cases has shown that, if given notice, defendants will simply shift financial accounts and ISPs, adopt new false identities and proceed with their counterfeiting unimpeded. (Hewlett Decl. ¶26).  The need for *ex parte* relief is especially great in today's global economy where counterfeiters have all of the advantages of anonymity provided by the Internet.  Without the requested relief, neither this Court nor Tory Burch will be able to prevent the disappearance or destruction of crucial evidence that would enable Tory Burch to track the sources of these Counterfeit Products.  Tory Burch is currently unaware of the true identities and locations of the Defendants, the location of other Infringing Web Sites that may be operated by Defendants, or the location of the Counterfeit Products that are being readied for distribution. (*Id*. ¶27).  It is vital that Tory Burch immediately obtain information concerning Defendants' sources, distribution network, and flow of profits to minimize future irreparable harm.

This Court's authority to issue the *ex parte* Restraining Order requested is specifically mandated by § 34 of the Lanham Act. 15 U.S.C. § 1116.  Congress's purpose in adopting the Trademark Counterfeiting Act in 1984 to provide for *ex parte* remedies was to ensure that courts were able to effectively exercise their jurisdiction in counterfeiting cases and to prevent counterfeiters given prior notice of an action from disappearing or quickly disposing of existing inventory of counterfeit items and the records relating to their manufacture and distribution. Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong.

Rec. H12076, at 12080 (Oct. 10, 1984).  This risk of counterfeiters disappearing or changing their operations if given prior notice is obviously greater today given that counterfeiters are operating exclusively online using false identities.

Once a violation of the Lanham Act is demonstrated, the issuance of an *ex parte* Order is appropriate upon a showing that: (i) the applicant trademark owner obtaining the order will provide adequate security; (ii) an order other than an *ex parte* Order is not adequate to achieve the purposes of 15 U.S.C. § 1114; (iii) the applicant has not publicized the requested seizure; (iv) the applicant trademark owner is likely to succeed in showing the defendants are using counterfeit marks; (v) an immediate and irreparable injury will occur if such seizure is not ordered; (vi) the materials to be seized will be located at the place identified in the application; (vii) the harm to the applicant in denying the application outweighs the harm to the legitimate interests of the persons against whom seizure would be ordered; and (viii) if the applicant were to proceed on notice to the defendants, the defendants or persons acting in concert with defendant would destroy, move, hide, or otherwise make such materials inaccessible to the Court. *See* 15 U.S.C. § 1116(d)(4)(B).

Given that this case involves a ring of anonymous counterfeiters doing business only over the Internet, this lawsuit would be an exercise in futility, without the requested *ex parte* relief Courts comprehending the unfortunate reality of this situation, the covert nature of counterfeiting activities, and the vital need to establish an economic disincentive for trademark counterfeiting, now regularly issue *ex parte* Orders such as the one requested. *See, e.g., PRL USA Holdings, Inc. v. Tan Boon Kiat, et al.*, No. 10-Civ-6456 (PGG) (S.D.N.Y. September 1, 2010); *Farouk Systems, Inc. v. EYOU International Trading Company, Ltd., et al.*, No. 4:10-Civ-2672 (KMH) (S.D.Tex. Aug. 2, 2010); *The North Face Apparel Corp. v. Jun Song, et al.*, No. 10-Civ-5604

(LTS) (S.D.N.Y. July 23, 2010); *The North Face Apparel Corp. and PRL USA Holdings, Inc. v. Fujian Sharing, et al.*, No. 10-Civ-1630 (AKH) (S.D.N.Y. March 2, 2010); *Cartier v. Ben-Menachem, et al.*, No. 06 CV 3917 (RWS) (S.D.N.Y. May 26, 2006); *Cartier Int'l B.V. v. Sam Liu*, 02 CV 7926, 2003 U.S. Dist. LEXIS 6381, at *8-9 (S.D.N.Y. Apr. 17, 2003). (Declaration of Seth E. Kertzer, dated December 13, 2010 ("Kertzer Decl.") Exhibit A).

Tory Burch meets each of the criteria for issuance of the request Order required by 15 U.S.C. 1116(d).[1] Tory Burch has not publicized that it is seeking the relief requested in the Order. (Kertzer Decl. ¶9). Tory Burch has submitted evidence to show Defendants' extensive offer for sale and sale of Counterfeit Products on Infringing Web Sites and using the Infringing Domain Names. (Hewlett Decl. ¶¶7-9, 12-14; Sachs Decl. ¶¶17, 20-24). Tory Burch has established that Defendants have gone to great lengths to conceal their true identities and that they are doing business only over the Internet. (Hewlett Decl. ¶¶17-28, 30). If given notice, Defendants can easily move or destroy all records of their identities and hide all evidence of their dealings in Counterfeit Products and continue business using new identities. (*Id.* ¶28). If this occurs, Tory Burch will suffer irreparable injury in that it will be denied access to the evidence to establish the identities of the counterfeiters and the accounting of profits to which Tory Burch is entitled.

Along with the other requested relief in the Order, Tory Burch respectfully requests an Order that domain name registries, namely Verisgn, Inc. for dot-com and dot-net domain names and Neustar for dot-us domain names, temporarily disable the Infringing Domain Names used by Defendants to host 'rogue' Tory Burch web sites where they sell Counterfeit Products. The use

---

[1]  Tory Burch has indicated the willingness and ability to provide a bond to the Court in conjunction with the *ex parte* relief that it seeks. *See* Tory Burch's [Proposed] Order, filed herewith.

of the TORY BURCH Marks in the Infringing Domain Names is causing consumers to purchase

Counterfeit Products based on the false belief that these Infringing Domain Names belong to and

are operated in conjunction with or under the permission of Tory Burch.  These sales of

Counterfeit Products confuse and harm consumers, and inflict irreparable harm upon Tory

Burch's business and reputation. (Sachs Decl. ¶¶17, 27-28).  Given Defendants' *modus operandi*

of fluidly moving their operations among dozens of phony names, it is crucial that Tory Burch be

able to prevent Defendants from simply moving their operations to new domain names and

identities. Other courts have granted such injunctive relief to prevent cybersquatters from

continuing to operate. *See, e.g.,Ford Motor Co. v. Lapertosa*, 126 F. Supp. 2d 463, 62

U.S.P.Q.2d 1789 (E.D. Mich., 2000); *Trans Union LLC v. Credit Research, Inc,* 142 F. Supp. 2d

1029 (N.D. Ill. 2001); *Ballistic Products, Inc. v. Precision Reloading, Inc*., 2003 U.S. Dist.

LEXIS 13148 (D. Minn. July 28, 2003).  This Court recently granted a Temporary Restraining

Order in a nearly identical situation, ordering the seizure of a large number of domain names

incorporating the plaintiffs' trademarks, which were being used by counterfeiters to offer

counterfeit goods. *The North Face Apparel Corp. and PRL USA Holdings, Inc. v. Fujian

Sharing, et al.*, Civil Action No. 10-Civ-1630.  (AKH) (S.D.N.Y. March 2, 2010)

Given the nature of Defendants' counterfeiting operations, an order other than an *ex parte*

Order would be inadequate to achieve the purposes of 15 U.S.C. § 1114.  The harm to the TORY

BURCH Marks, as well as the goodwill in denying the application greatly outweighs the harm to

Defendants' interests in continuing to sell Counterfeit Products.  If Tory Burch was to proceed

on notice to Defendants, given the shadowy, illicit nature of Defendants' counterfeiting

operations, it is clear Defendants would destroy, move, hide, or otherwise make such evidence

inaccessible to the Court.  It is thus respectfully submitted that an *ex parte* Order is necessary to

protect Tory Burch's trademark rights and to prevent further harm to Tory Burch and the consuming public.

## IV.   TORY BURCH IS ENTITLED TO AN ORDER PREVENTING THE TRANSFER OF DEFENDANTS' ASSETS

In addition, Tory Burch requests an order restraining Defendants' assets so that Tory Burch's right to an equitable accounting of Defendants' profits from sales of the Counterfeit Products is not impaired.  This Court and other district courts routinely provide for such relief to ensure the availability of an equitable accounting. *See, e.g., PRL USA Holdings, Inc. v. Tan Boon Kiat, et al.,* No. 10-Civ-6456 (PGG) (S.D.N.Y. September 1, 2010); *Farouk Systems, Inc. v. EYOU International Trading Company, Ltd., et al.,* No. 4:10-Civ-2672 (KMH) (S.D.Tex. Aug. 2, 2010); *The North Face Apparel Corp. v. Jun Song, et al.,* No. 10-Civ-5604 (LTS) (S.D.N.Y. July 23, 2010); *The North Face Apparel Corp. and PRL USA Holdings, Inc. v. Fujian Sharing, et al.,* No. 10-Civ-1630 (AKH) (S.D.N.Y. March 2, 2010); *Cartier v. Ben-Menachem, et al.,* No. 06 CV 3917 (RWS) (S.D.N.Y. May 26, 2006); *Cartier Int'l B.V. v. Sam Liu,* 02 CV 7926, 2003 U.S. Dist. LEXIS 6381, at *8-9 (S.D.N.Y. Apr. 17, 2003). (Kertzer Decl. Exhibit A).  Issuing the Order on an *ex parte* basis will ensure Defendants' compliance with the Order.  Experience shows that defendants in these types of cases will otherwise ignore orders restraining assets that are issued with prior notice and claim ignorance of their responsibilities while simultaneously draining their financial accounts before an order is issued, thereby rendering a plaintiff's right to an equitable accounting meaningless. (Hewlett Decl. ¶28).  Defendants are purposefully operating anonymously on the Internet, utilizing multiple false identities, precisely to conceal themselves and their assets from detection. (*Id.*).  In this case, given the plethora of accounts controlled by Defendants and the ease with which anonymous Defendants will be able to hide

their assets if given advance notice, it is particularly important that the Court order an *ex parte* freeze of all Defendants' assets from their counterfeiting operations located in the U.S.

Tory Burch has shown a strong likelihood of succeeding on the merits of its trademark counterfeiting claims, and thus it ultimately will be entitled to an equitable accounting of profits from sales of Defendants' Counterfeit Products. 15 U.S.C. § 1117. In the seminal case of *Reebok v. Marnatech*, a district court in the U.S. District Court for the Southern District of California granted the plaintiff a limited restraint of the defendants' assets for the purpose of preserving them, thus ensuring the availability of a meaningful accounting after trial. *Reebok Int'l Ltd. v. Marnatech Enter.*, 737 F. Supp. 1521 (S.D. Cal. 1989), *aff'd* 970 F.2d 552 (9th Cir. 1992). The Ninth Circuit affirmed the District Court's decision stating:

> Because the Lanham Act authorizes the District Court to grant [Plaintiff's] an accounting of [defendants'] profits as a form of final equitable relief, the District Court has the inherent power to freeze [defendants'] assets in order to ensure the availability of that final relief. *Id.* at 559; *see also Republic of Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988), *cert. denied*, 490 U.S. 1035 (1989).

In the years since *Marnatech*, virtually all the federal courts, including this Court, have granted the temporary restraint of counterfeiter's assets in cases similar to this one. Because the Lanham Act authorizes the award of an accounting of a counterfeiter's profits, the Court has the inherent power to freeze the counterfeiters' assets to assure the availability of that recovery. Restraint can be granted pursuant to Federal Rules of Civil Procedure Rules 64 and 65, under §§ 34 and 35 of the Lanham Act, and under the Court's inherent equitable power to issue provisional remedies ancillary to their authority to provide final equitable relief. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 986-987 (11th Cir. 1995); *Reebok v. Marnatech*, 970 F.2d at 558-61.

In determining whether to issue an order restraining a defendant's assets, a plaintiff must show (1) a likelihood of success on the merits; (2) immediate and irreparable harm as a result of defendants' counterfeiting activities; and (3) that defendants might hide their illegal ill-gotten funds if their assets were not frozen. *Reebok v. Marnatech*, 737 F. Supp. at 1524, 1527. As discussed previously, Tory Burch has shown all three factors, and accordingly, the grant of an injunction restraining the transfer of Defendants' assets is necessary and proper.

## V.   TORY BURCH IS ENTITLED TO EXPEDITED DISCOVERY

District courts have broad power to require early document production and to permit expedited discovery. *See* Fed. R. Civ. P. 30(b), 34(b). Expedited discovery may be granted when the party seeking it demonstrates: (1) irreparable injury; (2) some likelihood of success on the merits; (3) some connection between expedited discovery and the avoidance of irreparable injury; and (4) some evidence that the injury which will result without expedited discovery looms greater than the injury that defendant will suffer if expedited discovery is granted. *See, e.g., Advanced Portfolio Technologies, Inc. v. Advanced Portfolio Technologies Ltd.*, No. 94 Civ. 5620, 1994 U.S. Dist. LEXIS 18457, at *7 (S.D.N.Y. Dec. 28, 1994).

As demonstrated above, Tory Burch is being irreparably harmed by the manufacture, importation, offering for sale, distribution, and sale of Counterfeit Products by Defendants. While Tory Burch has learned some aspects of Defendants' counterfeiting activities, Plaintiffs do not yet know the following with any certainty: the true identities of Defendants, the scope of Defendants' activities, the source or location of the Counterfeit Products, or where the proceeds from Defendants' counterfeiting activities have gone. Tory Burch, therefore, needs to ascertain this information without delay. Only armed with this information can Tory Burch seek to amend the Complaint and Temporary Restraining Order and/or Preliminary Injunction to include other

individuals and entities involved in this counterfeiting operation and begin to stem the irreparable harm Tory Burch is suffering.

As set forth above, Defendants have gone to great lengths to conceal their true identities and/or move outside of this Court's reach by, among other things selling Counterfeit Products under false identities, using incomplete and phony return addresses on packages of Counterfeit Products they send to the U.S. in violation of CBP regulations and using false and incomplete information in their registrations for the Infringing Domain Names.  Similarly, Defendants are concealing their identities and profits from the sale of Counterfeit Products, by setting up multiple financial accounts, with providers such as PayPal, that appear from the outside to be separate and unrelated. (Hewlett Decl. ¶ 29).

The discovery requested on an expedited basis in the proposed Order has been precisely defined and carefully limited to include only what is essential to prevent further irreparable harm.  Discovery of these financial accounts in addition to Defendants' identities and information related to Defendants' Infringing Web Sites and other operations will permit Tory Burch to gain a full and accurate picture of Defendants' counterfeiting activities and ensure that these activities will be contained.

Tory Burch is unaware of any reason that Defendants or third parties cannot comply with these expedited discovery requests without undue burden.  Accordingly, the request for expedited discovery should be granted.

## VI.    SERVICE OF PROCESS BY EMAIL IS WARRANTED IN THIS CASE

Finally, Tory Burch requests the Court's permission to serve Defendants by registered electronic mail.  While Defendants are operating a highly-profitable business to sell Counterfeit Products to consumers in the U.S., including in this Judicial District, they are conducting

business only by email and over the Internet and concealing their true identities and addresses in each of the different facets of their businesses. (Hewlett Decl. ¶30).  Given the purposeful anonymity of Defendants' operations, Plaintiffs' investigators have been unable discover Defendants' actual identities and physical addresses.  It would be virtually impossible to serve Defendants unless the Court grants Tory Burch permission to serve by electronic mail. (Kertzer Decl. ¶¶ 5-9).

Fed. R. Civ. P. 4 provides flexibility in the procedures for giving defendants notice of commencement of an action in order to eliminate unnecessary technicalities in the service of process. 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1061, at 216 (2d ed. 1987). Assuming Defendants are located outside of the U.S. and in China, Plaintiffs must serve Defendants pursuant to Fed. R. Civ. P. 4(f). Fed R. Civ. P. 4(f)(3) allows this Court to authorize service of process on an individual in a foreign country by any means not prohibited by international agreement. *See Rio Properties*, *Inc. v. Rio International Interlink*, 284 F.3d 1007, 1014 (9th Cir. 2002); *cited by Phillip Morris USA Inc.,* 2007 U.S. Dist. LEXIS 19780, at *8 ("By design, Rule 4(f)(3), was 'adopted in order to provide flexibility and discretion to the federal courts in dealing with questions of alternative methods of service of process in foreign countries.'").  Both China and the United States are signatories to the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters which states "[t]his Convention shall not apply where the address of the person to be served with the document is not known." Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil and Commercial Matters, November 15, 1969, Article 1. (Kertzer Decl., Exhibit B).  In similar cases, Courts have allowed service on defendants in China by email. *See, e.g.,Chanel, Inc. v. Zhixian*, 2010 U.S. Dist. LEXIS 50745 (S.D. Fla. Apr. 29, 2010);

34

*Chanel, Inc. v. Lin et al.*, No. C-09-04996-JCS, 2010 U.S. Dist LEXIS 61295, at *11-12 (N.D.C.A. May 7, 2010). Additionally, Fed. Civ. R. P. 4 does not require that a party attempt service of process by those methods enumerated in Fed. Civ. R. P. 4(f)(2), including by diplomatic channels, before petitioning the Court for alternative relief under Fed. Civ. R. P. 4(f)(3). *Rio Properties*, 284 F.3d at 1015 (holding that Rule 4(f)(3) is "an equal means of effecting service of process under the Federal Rules of Civil Procedure" and that plaintiffs need not attempt other methods of service before seeking the court's approval of alternative service under Rule 4(f)(3)).

In addition to complying with the Federal Rules of Civil Procedure, the method of service of process must comport with due process. *Rio Properties*, 284 F.3d at 1016-17; *Phillip Morris USA Inc.,* 2007 U.S. Dist. LEXIS 19780, at *5. Due process requires that any service of notice be "reasonably calculated, under all circumstances, to appraise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). In similar cases, Courts have found that service by email is "constitutionally acceptable" to satisfy due process. *See, e.g., Rio Properties*, 284 F.3d at 1017; *Phillip Morris USA Inc.,* 2007 U.S. Dist. LEXIS 19780, at *8-9.

This Court and others have often permitted service of process by email to on-line businesses, especially in situations such as the case at hand where defendants are conducting illicit operations and corresponding with customers solely via the Internet and email while concealing their true physical addresses and identities. *See, e. g., Phillip Morris USA Inc.,* 2007 U.S. Dist. LEXIS 19780; *Prediction Co. LLC v. Rajgarhia*, Slip Copy, No. 09 Civ. 7459 (SAS), 2010 U.S. Dist. LEXIS 26536 (S.D.N.Y. Mar. 22, 2010); *Tishman v. The Associated Press*, 2006 U.S. Dist. LEXIS 4622 (S.D.N.Y. Feb. 6, 2006); *Bank of Credit & Commerce Int'l (Overseas)*

*Ltd. v. Tamraz,* No. 97 Civ. 4759 (SHS), 2006 U.S. Dist. LEXIS 39256 (S.D.N.Y. June 13, 2006). This Court has recently allowed for service of process by email in similar cases, where anonymous defendants operating a large network of web sites selling counterfeit apparel, conducted business only by email and utilized fake contact information to avoid detection. *PRL USA Holdings, Inc. v. Tan Boon Kiat, et al.*, No. 10-Civ-6456 (PGG) (S.D.N.Y. September 1, 2010); *The North Face Apparel Corp. v. Jun Song, et al.*, No. 10-Civ-5604 (LTS) (S.D.N.Y. July 23, 2010); *The North Face Apparel Corp. and PRL USA Holdings, Inc. v. Fujian Sharing, et al.*, No. 10-Civ-1630 (AKH) (S.D.N.Y. March 2, 2010). (Kertzer Decl. Exhibit A).

Email service is also the most reliable way of putting Defendants on notice of this action. The *Rio Properties* Court found "not only that service of process by e-mail was proper—that is reasonably calculated to apprise [defendant] of the pendency of the action and afford it an opportunity to respond—but in this case, it was the method of service most likely to reach [defendant]." *Rio Properties*, 284 F.3d at 1017. Similarly Tory Burch's investigators have communicated with and/or received emails from Defendants, at forty-nine (49) different email addresses. (Hewlett Decl. ¶31). Given that these email addresses are the ones in which Defendants conduct their illicit businesses, Tory Burch has every reason to believe that these email addresses are correct and that they are regularly monitored. (*Id.*). Plaintiffs' investigators have additionally uncovered thirty-six (36) PayPal accounts used by Defendants to receive payments. (*Id.* ¶32). Each of these PayPal accounts is linked to a unique email address. (*Id.* ¶¶31-32). Tory Burch proposes to send service via email to each of these eighty-five (85) email addresses, giving Defendants actual notice of this action many times over. (Hewlett Decl. Exhibit F.)

In an abundance of caution, Tory Burch proposes using an online service, RPost (www.rpost.com), which provides valid proof of authorship, content (e-mail body and attachments), delivery and official time sent and received. (Kertzer Decl. ¶8).  Thus, Tory Burch will be able to provide confirmation of delivery when Defendants receive email service.  Service by email would serve the interests of justice, not to mention the principles of fairness.  Accordingly, the Court should grant Tory Burch leave to serve Defendants with the Summons and Complaint as well as this Court's Order and supporting documents via Defendants' eighty-five (85) established email addresses.

## CONCLUSION

Defendants' counterfeiting operations are irreparably harming Tory Burch and the goodwill it has built up in its TORY BURCH Marks.  Without entry of the requested relief, Defendants will continue to deceive consumers into believing Defendants' Counterfeit Products sold on the Infringing Web Sites are genuine Tory Burch Products, when they are not.  Defendants are counting on the fact that brand owners like Tory Burch will, at most, challenge one or two of the vast number of Infringing' Web Sites under their control, allowing them to switch sites and names and continue with business as usual.  The only chance Tory Burch has to curtail Defendants' counterfeiting ring is through a comprehensive injunction allowing for the temporarily disabling of all these Infringing Web Sites and cybersquatted domain names, expedited discovery and the restraint of any assets of Defendants that Tory Burch is able to locate.

Based upon the foregoing, Tory Burch respectfully requests that this Court issue, *ex parte*: (i) a Temporary Restraining Order and Preliminary Injunction against Defendants enjoining the manufacture, importation, distribution, offer for sale, and sale of the counterfeit

Tory Burch Products; (ii) an Order temporarily disabling those Infringing Web Sites including those located at Defendants' domain names containing the TORY BURCH trademarks, (iii) an Order temporarily restricting transfer of Defendants' assets to preserve Tory Burch's right to an equitable accounting; (iv) an Order for Expedited Discovery allowing Tory Burch to access, inspect, and copy Defendants' records relating to the manufacture, distribution, offer of sale, and sale of the counterfeit Tory Burch products and Defendants' financial accounts; and (v) an Order allowing service of Defendants by electronic mail.

Dated: December 14 , 2010                    Respectfully submitted,

                                             GREENBERG TRAURIG, LLP

                                             By: _____

                                             Scott Gelin (gelins@gtlaw.com)
                                             Seth Kertzer (kertzers@gtlaw.com)
                                             MetLife Building
                                             200 Park Avenue
                                             New York, NY 10166
                                             Telephone: (212) 801-9200
                                             Facsimile: (212) 801-6400

                                             Attorneys for Plaintiffs Tory Burch LLC and
                                             River Light V, L.P.

38